[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11967
Non-Argument Calendar

_____

D.C. Docket No. 4:13-cv-00239-WTM-GRS


TYRONE T. MILLER,
SHEILA MILLER,

                            Plaintiffs - Third Party Defendants - Appellants,

versus

NAVALMAR (UK) LTD.,

                            Defendant - Third Party Defendant - Appellee,

GRIEG STAR SHIPPING, AS,

                            Defendant - Appellee,

GRIEG STAR AS, et al.,

                            Defendants,

HOMEPORT INSURANCE COMPANY,

                            Third Party Plaintiff - Third Party Defendant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(April 13, 2017)

Before MARCUS, JULIE CARNES and BLACK, Circuit Judges.

PER CURIAM:

This case arises from a negligence action brought by longshoreman Tyrone

T. Miller under Section 905(b) of the Longshore and Harbor Workers'

Compensation Act (LHWCA), 33 U.S.C. §§ 901-950, after he fell while loading

cargo into the M/V CARRARA CASTLE.[1]  The District Court granted summary

judgment in favor of the owner of the CARRARA CASTLE, Navalmar (UK) Ltd.

(Navalmar), and the vessel's charterer Grieg Star Shipping II AS (Grieg)

(collectively, the Defendants).  Miller appeals from that ruling asserting Grieg's

written cargo safety and storage procedures constituted active control over the

vessel requiring Grieg to exercise reasonable care toward longshoremen engaged

in the loading operation.  Miller also contends that both Grieg and Navalmar knew

a fall hazard existed on the vessel and were required to intervene and remedy the

dangerous condition when it became apparent that SSA/Cooper Stevedoring

_____

[1]Miller's wife, Sheila Miller, also brought a loss of consortium claim based on the
injuries suffered by her husband.  Her claim is entirely derivative of Miller's negligence action
brought under § 905(b), and so we need not address it further.

2

Company (SSA), the stevedoring firm charged with loading the CARRARA

CASTLE, failed to do so. After review, [2] we affirm.

## I. BACKGROUND

*A. Facts*

On September 28, 2011, Tyrone Miller, a member of the International

Longshoreman's Association since 2006, was employed by SSA to work a shift

loading the CARRARA CASTLE at the Georgia Ports Authority Ocean Terminal

in Savannah, Georgia. The CARRARA CASTLE was owned by Navalmar and on

time charter to Grieg. Pursuant to the time charter agreement, Grieg was allowed

to use the vessel's cargo spaces for loading cargo and transporting that cargo

overseas.[3] Grieg employed SSA and other stevedoring companies to handle the

actual cargo loading and unloading process at various ports across the globe.

Grieg provided SSA with information regarding cargo specifications along with

written guidelines detailing the proper methods for storing and securing particular

types of cargo. These procedures provided that they should not be changed

---

[2] "This court reviews a district court's grant of summary judgment de novo applying the same legal standards used by the district court." *Galvez v. Bruce*, 552 F.3d 1238, 1241 (11th Cir. 2008). "Summary judgment is appropriate where 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1271 (11th Cir. 2001) (quoting Fed. R. Civ. P. 56(c)).

[3] Under a typical time charter arrangement "the vessel owner commonly retains possession and control of the vessel, provides the crew and fully equips and maintains the vessel." Thomas J. Schoenbaum, 2 ADMIRALTY & MARITIME LAW § 11-5 (5th ed. 2011).

without consultation with Grieg's port captain, in this instance, Steve Snell, who was present during the loading process.  There is no evidence in the record suggesting Snell ever sought to enforce the loading procedures or otherwise interfere in SSA's loading operations.

On the day of Miller's accident, the CARRARA CASTLE had arrived in Savannah to pick up a shipment of Kraft Liner Board (KLB).  KLB is essentially cardboard tightly wound into a very large roll standing approximately eight feet high and weighing roughly 2,000 pounds.  SSA loaded these rolls into the hold of the CARRARA CASTLE using what is commonly referred to as the chime method.[4]  This method involves using a crane to stack the KLB rolls upright in interlocking rows.  The initial row is placed flush against either the port or starboard bulkhead of the vessel, and each new roll is slotted into the gap or "chime" between the two rolls in the preceding row.  Chiming is preferred over horizontally stowing the KLB rolls because the weight of the uppermost rolls would crush the open core of the supporting rows on the bottom of the hold rendering them unusable.  However, use of the chime method does result in the creation of gaps between the round edges of the rolls and the straight sides and corners of the cargo hold.

---

[4] Grieg's written procedures indicated that KLB rolls are to be loaded using the chime method.

4

When Miller arrived to begin his evening shift, the KLB rolls had already been stacked in four tiers standing approximately thirty-two feet high. Miller was instructed by his SSA supervisors to begin preparing the hold for tiers of a different commodity, wood pulp bales, by deploying plywood boards over the various void spots in the stacks of KLB rolls. After "a momentary lapse in concentration," Miller stepped on a plywood board he had just placed over one of the large corner gaps. The board gave way and Miller fell thirty-two feet to the floor of the hold suffering significant injuries. The record does not indicate that the plywood board itself was defective, and Miller offered no testimony to that effect. The record is clear that no fall protections were placed in the corner gaps before Miller began covering them with plywood.

## B. Procedural History

Miller originally filed his negligence suit against Navalmar on September 30, 2013 in the State Court of Chatham County, Georgia. Navalmar removed the action to the United States District Court for the Southern District of Georgia on November 5, 2015. Following removal, Miller filed several amended complaints articulating new negligence theories, and, on April 29, 2014, named Grieg as a defendant in the action. After extensive discovery, Grieg and Navalmar filed independent motions for summary judgment on May 27, 2015. The Defendants primarily argued that under § 905(b) of the LHWCA neither Navalmar nor Grieg

5

owed a duty of reasonable care toward Miller. The district court agreed and granted the Defendants' motions for summary judgment. This appeal followed.

## II. DISCUSSION

As originally written, the LHWCA made shipowners strictly liable for injuries suffered by longshoremen due to a vessel's unseaworthiness as proven by the existence of an unsafe, injury-causing condition on the vessel. *See Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156, 164–65 (1981). But in 1972, Congress radically altered this scheme by, among other things, adding a statutory cause of action for negligence against the shipowner, § 905(b), to the LHWCA and abolishing a longshoreman's right to recover in strict liability for injuries suffered due to unseaworthiness. *Id.* at 165. Ordinary negligence principles govern statutory claims brought under § 905(b) and the vessel owes the stevedore and her longshoremen employees the duty of reasonable care "under the circumstances." *Id.* at 166–67 (quoting *Marine Terminals v. Burnside Shipping Co.*, 394 U.S. 404, 415 (1969)).

But, the shipowner is entitled to rely on the stevedore "to avoid exposing the longshoremen to unreasonable hazards," and may otherwise expect the stevedore to "perform his task properly without supervision." *Id.* at 170. "[A]bsent contract provision, positive law, or custom to the contrary . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover

dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Id.* at 172. However, shipowners do owe three distinct duties, known as *Scindia* duties after the case establishing them, during cargo operations. These duties are (1) the turnover duty, (2) the active control duty, and (3) the duty to intervene. *See Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98 (1994) (describing the three primary duties created by the Supreme Court in *Scindia*). On appeal, Miller only alleges breach of the active control duty and the duty to intervene, having expressly abandoned his turnover duty claims.[5]

## A. Active Control Duty

A time charterer violates the active control duty under *Scindia* if it "actively involves itself in the cargo operations and negligently injures a longshoreman." *Scindia*, 451 U.S. at 167. Here, Miller primarily argues Grieg's provision of a detailed loading procedure to the stevedore, SSA, and the presence of a port captain aboard the CARRARA CASTLE during the loading process constituted active involvement in the cargo operation and created a duty of reasonable care toward Miller and the other longshoremen.[6] He contends Grieg subsequently

---

[5] Although the parties have noted some ambiguity in the LHWCA's treatment of time charterers as compared with shipowners, the District Court assumed that Grieg owed the same duties under the LHWCA as the shipowner, Navalmar. On appeal, the parties do not take issue with that assumption, so we will also assume, without deciding, that Grieg and Navalmar owed identical duties under § 905(b).

[6] The record does not contain any evidence indicating the port captain actually took steps to enforce the written loading procedures provided by Grieg.

breached this duty by not providing adequate fall protection to guard against the deep corner voids necessarily created by the KLB storage method required under the loading procedure.  Because we find neither Grieg's storage plan nor the supervisory presence of a port captain during loading constitute active control sufficient to create a *Scindia* duty, we need not reach the question of breach.

While it is true that *Scindia* itself does not define active involvement in cargo operations, it makes clear that once control over the vessel is relinquished "primary responsibility for the safety of the longshoremen lies with the stevedore." *Lampkin v. Liber. Athene Transp. Co.*, 823 F.2d 1497, 1501 (11th Cir. 2014); *see also Scindia*, 451 U.S. at 170 (noting under the LHWCA it is the responsibility of "the stevedore, the longshoremen's employer, to provide a 'reasonably safe' place to work").  And, the Supreme Court has carefully explained at least some level of involvement in cargo operations does not automatically generate a duty on behalf of the shipowner.  *Howlett*, 512 U.S. at 103 (noting that even though the vessel and its crew maintain some involvement in the cargo loading and storage process "[i]t is settled maritime custom and practice that the stevedore exercises primary control over the details of a cargo operation").

Indeed, the provision of a stowage plan to the stevedore, routine practice in the shipping industry, is not enough to constitute active control because "it is the stevedore, an independent contractor hired for its expertise in the stowage and

8

handling of cargo, that is charged with actual implementation of the plan." *Id.*
Nor is the simple presence of supervisory personnel during cargo operations
sufficient to constitute "the type of active involvement and control that would
trigger the ship's liability." *Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490, 494 (3d
Cir. 1987); *Bonds v. Mortensen and Lange*, 717 F.2d 123, 127 n.4 (4th Cir. 1983)
(explaining "we do not take the presence of an officer of the ship's crew to
constitute 'active involvement' in discharge operations").  The record shows
Grieg's involvement in the cargo loading operation was limited to the provision of
a stowage plan to the stevedore, SSA, and the presence of a port captain to observe
the loading process.  As a matter of law, this level of passive oversight is not
enough to create a duty based on active involvement with cargo operations under
*Scindia* and its progeny.

Miller presents no case law to rebut this conclusion and instead contends
Grieg's use of mandatory shipping procedures represented a much greater level of
control over the loading process than is typical in the shipping industry.  These
mandatory procedures, when coupled with the supervisory presence of Grieg
personnel, constituted enough direct control over the stevedore to constitute active
involvement in the cargo loading process.[7]  This argument is unconvincing.
Congress intended § 905(b) and the other 1972 amendments to the LHWCA to

---

[7] For purposes of this appeal, we assume Miller is correct and Grieg's loading procedures were mandatory, unless amended by the supervisory port captain.

9

"make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore." *Scindia*, 451 U.S. at 168. Yet, Congress also recognized that the shipowner need not remain totally detached from the cargo loading operation. *Id.* Naturally, the shipowner has a business interest in the cargo and customarily provides a cargo plan or other loading instructions. *Id.* But, consistent with longstanding maritime process, it remains the stevedore's job to implement those instructions safely, and overseeing or assisting in that implementation is beyond the shipowner's "ordinary province." *Howlett*, 512 U.S. at 103, 114 S. Ct. 2057 (explaining shipowners may rely on the stevedore's expertise in conducting cargo operations safely); *see also Mallard v. Aluminum Co. of Can., Ltd.*, 634 F.2d 236, 243 (5th Cir. Jan. 1981) (explaining the shipowner is not liable in circumstances where "either the stevedore or his employee is in a better position to appreciate fully the obvious risk and avoid the danger, particularly where the danger is within the control of the stevedore's own employees" (quotation omitted)). Thus, under *Scindia*, the shipowner must actually involve itself in the operational details of loading, or otherwise directly control the loading efforts of involved longshoremen effectively displacing the stevedore from its traditional control over loading operations.

Even if Grieg's loading instructions were mandatory, the procedures simply lack direct operational guidance with respect to their implementation. There is no evidence in the record that Grieg's personnel supervised the loading process, or were involved with the loading operation in any direct way. Instead, the procedures merely provide explanations for the proper storage of particular types of cargo, and require the stevedore to keep Grieg updated when making major alterations to these protocols. This type of passive guidance does not constitute the direct involvement in loading operations *Scindia* requires before an active control duty is imposed on the shipowner.[8] Accordingly, we find Grieg did not owe Miller a duty of reasonable care based on its active involvement in cargo operations.

## B. Duty to Intervene

Under *Scindia*, a shipowner[9] has a duty to intervene and protect a longshoreman once cargo operations have begun even if it is not actively involved

---

[8] Miller also contends the mandatory nature of the cargo plan effectively disabled the stevedore from using its own judgment to "[take] ameliorative measures to avoid the hazard." *Keller v. United States*, 38 F.3d 16, 24 (1st Cir. 1994). However, there is no evidence to support that assertion. Indeed, the record reveals the stevedore, SSA, retained ultimate control over the loading operation and had "the ability to just stop the operation" based on safety concerns. And, in any event, the Grieg procedures are silent with respect to the specific deployment of particular types of fall protections. The loading instructions simply do not reveal any attempt to restrict the stevedore's ability to employ its expertise to protect Miller and the other longshoreman during cargo operations. Moreover, Miller does not allege the existence of any express oral or written agreement in which Grieg assumed safety responsibilities during loading operations. In the absence of such an agreement, the record does not support an inference that Grieg sought to displace SSA from primary operational control over loading operations.

[9] As previously noted, we assume without deciding that, under the circumstances presented in this case, time charterers and shipowners owe identical duties under *Scindia*.

in those operations if "[the shipowner] becomes aware that the ship or its gear poses a danger to the longshoremen and that the stevedore is failing, unreasonably, to protect the longshoremen." *Lampkin*, 823 F.2d at 1501 (quoting *Clark v. Bothello Shipping Corp.*, 784 F.2d 1563, 1565 (11th Cir. 1986)).  Importantly, a shipowner only has "a duty to intervene when it has actual knowledge of a dangerous condition and actual knowledge that the stevedore, in the exercise of 'obviously improvident' judgment, has failed to remedy it." *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1248 (5th Cir. 1997) (quoting *Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13, 17 (5th Cir. 1992)).  The duty to intervene is an exceedingly narrow one and "[o]nly the most egregious decisions by the stevedore are 'obviously improvident.'"  *Harris v. Pac. Gulf-Marine, Inc.*, 967 F. Supp. 158, 165 (E.D. Va. 1997); *see also Greenwood*, 111 F.3d at 1249 (noting obvious improvidence requires the stevedore to "use an object with a defective condition that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm even when the stevedore's expertise is taken into account").

Miller argues the record indicates the Defendants must have been aware of the dangerous voids in the corner of the CARRARA CASTLE's cargo hold because those voids were a necessary result of the chiming method used to store rolls of KLB.  Miller also contends the Defendants had actual knowledge that the

12

stevedore was failing to remedy the hazard posed by the corner voids both because the loading procedure actively prevented SSA from ameliorating the condition and, in any event, the voids created by use of the chiming method were a necessary part of the process that the stevedore could not have remedied.

However, even if we assume that the Defendants had actual knowledge of the dangerous condition resulting from chiming the KLB rolls in the CARRARA CASTLE's hull, Miller has made no showing that they had actual knowledge of SSA's failure to remedy the problem. As the district court pointed out, Miller does not allege SSA or any of its employees ever complained to the Defendants regarding unsafe conditions during loading. *See Roach v. M/V Aqua Grace*, 857 F.2d 1575, 1582 (11th Cir. 1988) (affirming summary judgment because absent complaints to the ship the owner had no notice of failure to ameliorate hazardous condition and thus no duty to intervene); *Bonds*, 717 F.2d at 127–28 (no duty to intervene regarding obvious hazard in part because "longshoremen proceeded to unload the ship's cargo without complaint or incident"). Nor does Miller suggest SSA took any abnormal action during the loading process. Most importantly, there is no indication in the record that personnel from either Navalmar or Grieg oversaw the loading operation, inspected the cargo hold, or otherwise acquired actual knowledge of the stevedore's exercise of "obviously improvident" judgment in failing to deal with the safety hazards posed by the large corner voids in the

13

KLB stacks.  Accordingly, the Defendants were entitled to rely on the stevedore to "perform his task properly without supervision."  *Scindia*, 451 U.S. at 170.

Miller seeks to avoid this result by contending that the chimed method of stacking KLB rolls was so hazardous it simply could not have been ameliorated by the stevedore.[10]  The use of such an inherently dangerous cargo storage method by the shipowner could be viewed as direct negligence and consequently might require the shipowner to intervene and ameliorate the hazard.  *See Keller v. United States*, 38 F.3d 16, 24 (1st Cir. 1994).  However, the chimed method of shipping KLB rolls has been in widespread use for decades, and the record demonstrates there is nothing unusual or hazardous about the method.  Additionally, Miller has failed to demonstrate the chimed method is so inherently dangerous the stevedore could not fulfill its ordinary obligation of providing longshoremen with a reasonably safe working environment during cargo operations.  Indeed, the better part of Miller's brief is spent arguing the hazards posed by chiming the KLB stacks were easily avoidable through the use of ordinary safety measures.  This argument must fail as well.  The district court did not err in finding the Defendants lacked actual knowledge regarding SSA's inability, or failure, to remedy a dangerous fall

---

[10] Miller also argues that the mandatory loading procedures had a similar effect.  But, as we have already explained, the loading procedures did not actually diminish the stevedore's operational control over the loading operation.  Nor did the procedures indicate an attempt on the part of Grieg to assume responsibility over the practical implementation of the cargo plan.

14

hazard on the CARRARA CASTLE, and consequently they had no duty to intervene in routine cargo loading operations under *Scindia* and its progeny.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**