[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 16-16796

————————————————

D.C. Docket No. 8:15-cv-01806-SDM-JSS

ANTOINETTE DIXON,

Plaintiff-Appellant,

versus

NYK REEFERS LTD., ET AL.,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

(August 3, 2017)

Before ED CARNES, Chief Judge, and WILLIAM PRYOR, Circuit Judge, and MOORE,[*] District Judge.

---

[*] Honorable K. Michael Moore, United States District Chief Judge for the Southern District of Florida, sitting by designation.

K. MICHAEL MOORE, District Judge:

A crane unloading a vessel's cargo lowered a metal tray onto longshoreman Robert L. Dixon, killing him. Decedent's spouse, Antoinette Dixon, sued the vessel and the vessel's charterer, alleging negligence. On summary judgment, the district court held that the vessel's owner and charterer were not negligent because they owed no duty to intervene where there was no evidence of a defect in the vessel or its gears. On appeal, Ms. Dixon argues that the district court erred by interpreting a vessel's duty too narrowly and that material issues of fact exist regarding the crew's knowledge of the stevedoring operations such that a jury could find Defendants owed a duty to intervene in those operations and breached that duty. Upon review, we affirm.

## I. BACKGROUND

On May 14, 2012, the cargo vessel M/V Wild Lotus ("the Wild Lotus" or "the vessel") docked at Port Manatee, Florida, to discharge its cargo of Del Monte pineapples and bananas. The Wild Lotus is owned by defendant NYK Reefers, LTD, and at the time of the accident was chartered by Cool Carriers AB (collectively, "Defendants").[1] Del Monte hired Logistec as stevedore to load and unload cargo from its vessels on a weekly basis throughout the year. Logistec decides what equipment is used in any particular discharge operation and provides

---

[1] The Court need not draw a distinction between the Defendants upon affirming the district court's decision that neither owed a duty to intervene.

2

the equipment used to unload the cargo, including the lifting trays, forklifts, and spreader bars. Logistec has been responsible for stevedore operations on various vessels for Del Monte fruit at Port Manatee, Florida. Logistec unloaded cargo from the Wild Lotus once before—the week prior to the accident.

The Wild Lotus has four holds, each with an opening known as a "hatch" on the deck to permit loading and unloading. The vessel was equipped with four cranes, one for each hold. Containers on the vessel's deck are offloaded first. The hatches are then opened to allow access to the cargo in the holds. The first pallets in the holds are removed by attaching a "breakout bar" to lines attached to those pallets. The pallets are then hoisted out of the hold by the ship's cranes. Once enough pallets have been removed to clear space, forklifts are lowered into the hold to continue unloading cargo. Each forklift driver moves a pallet of cargo onto a 5,500-pound steel lifting tray and, once four pallets are on the tray, it is lifted out of the hatch by shipboard cranes. This process is repeated until all of the cargo is completely offloaded.

Longshoremen unload vessels. The gang is divided into two parts, one that handles unloading on the vessel side of operations and the other that does so on the shore side. A longshoreman gang on the vessel side generally has four forklift operators, one lander, and one header, and two crane operators on the deck. The header is the person responsible for directing the gang and making decisions

3

regarding the operation, as well as maintaining radio communication between the longshoremen in the hold and the crane operator. A lander ensures that all debris is out of the way of the forklifts as they move; a lander also often serves as a flagman to communicate with the crane operator when a crane operator lacks precise and unrestricted visibility of the site where the tray is to be lowered. Generally during stevedoring operations, both the crane operators and the header have radios.

Before stevedoring operations began, Logistec's ship superintendent met with the vessel's Chief Officer to obtain crane certifications and confirm that the cranes were in good condition. No dangerous conditions were reported to the vessel's crew prior to the accident.

On May 12, 2014, the "Archie" gang—named after its header, Henry Archie—was assigned to hold #2. Mr. Dixon was a forklift operator in the Archie gang. Henry Archie was not with his gang in hold #2, nor was he on the ship that morning, leaving the gang without a header at the time of the accident. There was no lander at the time either; the lander was standing in for one of the forklift drivers who was on a break at the time. The crane operator who lowered the tray onto Mr. Dixon did not have a radio at the time of the accident, nor did anybody within hold #2.

After approximately an hour of offloading in hold #2, one of the Archie gang's longshoremen stalled his forklift in the landing zone of the open hatch area

as the tray was being lowered. Mr. Dixon ran into the open hatch area to restart the stalled forklift. Tragically, the crane operator lowered the 5,500-pound tray onto Mr. Dixon before he could leave the landing area; Mr. Dixon died as a result.

On summary judgment, the district court stated that "[a] hazard attendant to the stevedore's alleged negligence imposes on the vessel no duty to intervene" and that "[o]nly a defect in the vessel or in the vessel's equipment triggers a vessel's duty to intervene." The district court found no evidence of a defect in the vessel or its equipment, and no such defect was alleged. The district court held that, viewing the facts in the light most favorable to Ms. Dixon, summary judgment was appropriate because Ms. Dixon failed to show that Defendants had a duty to intervene and a claim of negligence requires a duty.

## II. STANDARD OF REVIEW

"This Court reviews *de novo* summary judgment rulings and draws all inferences and reviews all evidence in the light most favorable to the non-moving party." *Craig v. Floyd Cty.*, 643 F.3d 1306, 1309 (11th Cir. 2011) (quoting *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011)).

## III. DISCUSSION

Prior to 1972, the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901–950, held shipowners strictly liable for injuries to longshoremen that were the result of a ship's unseaworthiness as proven by the

5

existence of an "unsafe, injury-causing condition on the vessel." *See Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 164–165 (1981). In 1972 Congress "radically altered this scheme by, among other things, adding a statutory cause of action for negligence against the shipowner." *Miller v. Navalmar (UK) Ltd.*, No. 16-11967, 2017 WL 1359831, *2 (11th Cir. Apr. 13, 2017).

In *Scindia*, the Supreme Court addressed the crew's duty to intervene when a longshoreman was injured as a result of a winch on the ship breaking during cargo unloading. *Scindia*, 451 U.S. at 175. The Supreme Court stated "Congress intended to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore." *Id.* at 168. There is no continuing duty for the shipowner "to take reasonable steps to discover and correct dangerous conditions that develop during the loading or unloading process." *Id.* at 169. "[A]bsent contract provision, positive law, or custom to the contrary[,] . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Id.* at 172. The Supreme Court thus established three distinct duties, the "*Scindia* duties," a shipowner does owe longshoremen during cargo operations. *Miller,* 2017 WL 1359831, *2. First, under the turnover duty, "a vessel must 'exercise ordinary care under the circumstances' to turn over the ship

and its equipment and appliances 'in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care' to carry on cargo operations 'with reasonable safety to persons and property.'" *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98 (1994) (quoting *Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416–417, n.18 (1969)). Second, under the active control duty, a shipowner is to exercise reasonable care to prevent injuries to longshoremen in areas that are under the shipowner's active control. *Id.* Third, under the duty to intervene, a shipowner must intervene if "during stevedoring operations, the shipowner becomes aware that the ship or its gear poses a danger to the longshoremen and that the stevedore is failing, unreasonably, to protect the longshoreman." *Clark v. Bothelho Shipping Corp.*, 784 F.2d 1563, 1565 (11th Cir. 1986).

The issue before the Court now is whether Defendants breached this third *Scindia* duty—the duty to intervene. The dangerous conditions alleged here fit into two categories: (1) negligent actions of the stevedore and (2) allegedly unsafe equipment provided by Defendants. Neither set of allegations triggered a duty to intervene. Ms. Dixon also unsuccessfully argues that it was Defendants' custom to monitor the stevedoring operations, triggering the duty to intervene. We address each argument in turn.

A. The Stevedore's Failure to Use a Header, a Lander, or Radios Does Not Support a Finding That Defendants Had a Duty to Intervene in the Stevedore's Cargo Unloading Operations.

Ms. Dixon does not dispute that Logistec was negligent but argues that Defendants were also negligent by failing to intervene in the stevedore's unsafe cargo unloading operations. Specifically, Ms. Dixon argues that the cargo operations posed an unreasonable risk of harm to the longshoreman and the Defendants owed a duty to intervene because the longshoremen were unloading cargo: (1) without a header, who is supposed to look over the hatch to see that there are no longshoreman in the landing area before the tray is lowered; (2) without a lander, who clears the deck and communicates with the crane operator while the tray is being lowered into the hold; and (3) without any radio communication between the longshoremen and the crane operator.

Ms. Dixon argues that although these conditions are not defects in the vessel or its gears, Defendants still owed a duty to intervene. Ms. Dixon primarily relies upon this Court's opinion in *Clark v. Bothelho Shipping Corp.*, in support of the argument that the vessel's scope of liability extends beyond a physical defect in the ship or its gear. 784 F.2d 1563. *In Clark,* the appellant was a longshoreman employed by a stevedoring company who alleged injury from slipping in a puddle of grease that was on the deck of the ship where he was unloading cargo. *Id.* at 1563. The stevedoring superintendent testified that he inspected the ship's deck

8

before stevedoring operations began and that he did not see a grease spot. *Id.* at 1566. There was no evidence whatsoever indicating that the grease spot existed prior to stevedoring operations. *Id.* The district court granted a directed verdict in favor of the shipowner because "[u]nder *Scindia*, once stevedoring operations began, [the shipowner] had no duty to discover the dangerous condition." *Id.* This Court affirmed the decision.

Despite this Court's affirmance in *Clark*, Ms. Dixon argues that *Clark* stands for the proposition that if a shipowner knows of a dangerous condition, as opposed to a defect in the ship or its gear, it may be held liable for injuries that result from that dangerous condition. In dicta, the Court stated that "[t]he only way [the shipowner] may be held liable for [plaintiff's] injuries is if [the shipowner] knew of the dangerous condition yet failed to protect [plaintiff] from it." *Clark,* 784 F.2d at 1566. Ms. Dixon suggests that this statement is the Court's recognition that a shipowner may be held liable for an injury that is not the result of a defect in the ship or its gear. Further, Ms. Dixon argues that here, unlike in *Clark*, the vessel's crew knew of the dangerous manner in which the longshoremen were operating and may be held liable for Dixon's death.

First, Ms. Dixon relies upon dicta. The holding in *Clark* is limited to those facts: a longshoreman was injured as a result of a transitory condition that appeared on the ship's deck after stevedoring operations began. Second, the puddle of grease

was a dangerous condition—not a dangerous activity as alleged here. A dangerous condition on a ship's deck is arguably much more within the providence of a shipowner than a dangerous activity taking place aboard a ship.

Even if the scope of liability extends to dangerous activities, there is no evidence that the Wild Lotus's crew was aware of the dangerous manner in which the stevedoring operations took place. The presence of a header, the presence of a lander, and the use of radios are all conditions that could have remedied the perilous effects of the crane operator's limited visibility. It is undeniable that the absence of these factors, in combination, contributed to Mr. Dixon's death. It is not evident however that the omission of any one is "obviously improvident." Critically, it is not evident that any crew member was aware of the existence of all three of these problems. The captain was not on the deck at the time of Dixon's accident, so despite his testimony that he knew of the lack of flagmen and a warning system, there is no evidence that he knew of the crane operator's limited visibility into hold #2 at the time of the accident. The crew members that were on the deck at the time of the accident were not near hold #2, nor is there evidence that they were aware of the crane operator's limited visibility. "[T]he mere presence of a vessel's crew on the ship is insufficient to prove even constructive knowledge—let alone actual knowledge—of a hazard." *Green v. United States*, 700 F. Supp. 2d 1280, 1304 (M.D. Fla. 2010) (citing *Stockstill v. Gypsum Transp.*,

10

607 F.2d 1112, 1117 (5th Cir. 1979)). The record does not support a finding that any crew member had actual or constructive knowledge of the crane operator's limited visibility into the hatch.

Even if Defendants had actual knowledge of the dangerous condition resulting from the stevedore's negligence, Ms. Dixon has not shown that Defendants knew of Logistec's failure to remedy the problem. As noted above, neither Logistec nor any of its longshoremen complained to Defendants about unsafe conditions before or during cargo unloading.

Recently this Court affirmed summary judgment in favor of a shipowner and charterer where an injured longshoreman alleged breach of the duty to intervene, as well as breach of active control duty. *Miller*, 2017 WL 1359831. The plaintiff alleged that the defendants must have had actual knowledge of the dangerous condition—gaps in flooring that were the result of the method of cargo loading— as well as actual knowledge that the stevedore failed to remedy the dangerous condition. *Id.* at *4. The Court found that "even if we assume that the Defendants had actual knowledge of the dangerous condition . . . [plaintiff] has made no showing that they had actual knowledge of [the stevedore's] failure to remedy the problem." *Id.* at *5. The plaintiff did not allege that the stevedore or any of its employees ever complained to the shipowner regarding unsafe conditions during loading. *Id.* Finally, nothing in the record indicated that the vessel's personnel

11

"oversaw the loading operation, inspected the cargo hold, or otherwise acquired actual knowledge of the stevedore's exercise of 'obviously improvident' judgment in failing to deal with the safety hazards." *Id.* The Court held that the defendants were entitled to rely on the stevedore to perform his task properly without supervision. *Id.* Here, as in *Miller*, Ms. Dixon points to no evidence that the vessel's crew oversaw the unloading operation, inspected the cargo hold, or had actual knowledge of Logistec's failure to remedy the safety hazards posed by the crane operator's limited visibility.

Ms. Dixon argues that Defendants had a duty to intervene because they should have been aware that the longshoremen would confront rather than avoid the hazard. In support, Ms. Dixon cites to *Hill v. Reederei F. Laeisz G.M.B.H., Rostock,* 435 F.3d 404, 410 (3d Cir. 2006). In *Hill*, a jury returned a verdict in favor of the defendants, a shipowner and a ship operator. *Id.* at 407. The plaintiff was severely injured when, while loosening steel rods during cargo unloading, a rod sprung off its housing, flew through the air, and hit the plaintiff in the head. *Id.* The plaintiff appealed the judgment on various grounds, including that the jury instructions did not properly set forth the duties a shipowner owes longshoremen. *Id.* at 408. The Court of Appeals for the Third Circuit vacated the district court's judgment and remanded. *Id.* at 407. The Court held that the district court's instruction regarding the turnover duty when there is an open and obvious hazard

12

did not properly convey the rule set forth in *Kirsch v. Plovidba*, 971 F.2d 1026 (3d Cir. 1992). *Hill*, 435 F.3d at 409. Ms. Dixon's reliance is misplaced—not only does the decision lack precedential effect in this circuit, but the Third Circuit addressed longshoremen's confrontation rather than avoidance of hazards in the context of the turnover duty, not the duty to intervene. *Id.* at 408–409. Appellant cites no applicable case law from either this Court or the Supreme Court of the United States.

Defendants were entitled to rely upon Logistec to unload the cargo properly without supervision.

B.  The Lack of a Warning System on the Cranes Does Not Trigger the Vessel's Duty to Intervene.

Ms. Dixon also argues that the accident could have been prevented had the vessel been equipped with an audio or visual warning system on the cranes. Despite Ms. Dixon's assertion that the accident was the result of "dangerous circumstances that did not arise out of a defect in the ship or its gear," this cannot be construed as anything but a claim of a defect in the ship or its gears. This would raise the first *Scindia* duty—the turnover duty—for failure to turn over a vessel in safe condition. But Ms. Dixon does not and cannot allege a breach of the turnover duty because Logistec certified that the vessel and its equipment were in good condition when Logistec began its operations. Presumably, this is why Ms. Dixon attempts to cloak this argument as one pertaining to the duty to intervene. But even

13

if Ms. Dixon alleged a breach of the turnover duty, the evidence shows that the crane was turned over in a reasonably safe condition. Logistec's security officer testified that he had seen warning devices on some ships but that it was not commonplace for this type of vessel to have alarms. He also testified that he did not think that such alarms would make the loading and unloading process safer for the stevedores. Thus, a claim that Defendants breached the turnover duty would also fail.

The lack of an audio or visual warning system on the cranes, a condition that existed prior to turning over the vessel, is not a dangerous condition that triggered the duty to intervene. There is no evidence that Defendants were notified that the absence of warning devices was a problem or that the longshoremen failed to remedy the problem. This argument also fails.

C. The Evidence Does Not Support a Finding That it Was Defendants' Custom to Monitor Cargo Operations.

The evidence does not support a finding that Defendants customarily monitored cargo operations such that they would have discovered the dangerous conditions alleged. In *Scindia,* the Supreme Court said "absent contract provision, positive law, or custom to the contrary[,] . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Scindia,* 451 U.S. at 172. Here, Ms. Dixon fails to

14

identify any facts suggesting that it was customary for the vessel's crew to discover dangerous conditions.

The captain's testimony, the existence of a pre-cargo operations checklist and a cargo planning checklist, and the presence of crew members on deck, are not evidence that the vessel customarily monitored cargo operations in order to discover conditions dangerous to longshoremen. When asked if the captain monitors third parties on the vessel, Captain Dovbna testified:

> If while cargo operations [are ongoing] we detect a notice that action of any third party present on board might cause potential damage to [the] vessel, might cause violation of intactness and quality of cargo, might cause any unsafe circumstances and conditions for crew members and if that also would not comply with the standard safety measures being taken then we must inform to the manager of that third party.

In any light, this testimony is not evidence that the crew customarily undertook inspection of cargo unloading to detect dangerous conditions. Similarly, the mere presence of two crew members on the main deck during cargo operations does not lead to the conclusion that Defendants took on the task of discovering dangerous conditions that were the result of the stevedore's negligence. Further, even if the crew members were positioned on the deck for such a purpose, it is not alleged that crew members were stationed within the holds generally or within hold #2 specifically, where the accident occurred. The testimony regarding the pre-cargo operations checklist and cargo planning checklist also pertains to Defendants' actions upon notification of a dangerous practice—not to an affirmative obligation

15

to discover a dangerous practice or a custom of doing so. At best, the evidence suggests that it was customary for the vessel's crew to act in a prescribed manner upon notification of a dangerous condition.

There is no dispute that negligence led to Mr. Dixon's tragic death. But the Defendants were not the negligent parties. Defendants were entitled to rely on the stevedore to "perform his task properly without supervision." *Scindia*, 451 U.S. at 170. The district court did not err in granting summary judgment in favor of the vessel.

## IV. CONCLUSION

We **AFFIRM** the district court's grant of summary judgment.

16